**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

**FEDERAL INSURANCE CO., an**
**Indiana corporation, subrogee of**
**NORVEST, L.L.C., a Michigan**
**limited liability company and**
**NORQUICK DISTRIBUTING CO.,**
**a Michigan corporation,**

          **Plaintiff,**

                                      **Case No.      02-70236**

**v.**

                                      **HONORABLE DENISE PAGE HOOD**

**THE HARTFORD STEAM BOILER**
**INSPECTION AND INSURANCE CO.,**
**a Connecticut corporation,**

          **Defendant.**

_____/

**MEMORANDUM OPINION AND ORDER**

**I.      INTRODUCTION**

       This matter is before the Court on Defendant's Motion for Summary Judgment, filed May

8, 2006; Plaintiff Federal Insurance Company's Motion for Summary Judgment, filed May 8, 2006;

and Defendant's Motion to Strike the Affidavit of Jon Dattilo, filed June 2, 2006.

       On September 30, 2003, this Court entered an Opinion and Order granting Defendant's

Motion for Summary Judgment and denying Plaintiff's Motion for Summary Judgment. Plaintiff

appealed to the Sixth Circuit Court of Appeals. On July 8, 2005, the Court of Appeals reversed this

Court's Judgment and Opinion and Order and remanded the case for further proceedings. The

parties filed Cross-Motions for Summary Judgment responsive to the Opinion of the Court of

Appeals.

## II.    STATEMENT OF FACTS

Plaintiff, Federal Insurance Company, issued a commercial package insurance policy to Norvest, L.L.C. ("Norvest") and Norquick Distributing Company, Inc. ("Norquick").  This policy was effective for a one-year period commencing December 1, 1999.  Defendant, The Hartford Steam Boiler Inspection and Insurance Company, issued an equipment breakdown insurance policy to Norvest and Norquick.  Defendant's policy was effective for a one-year period commencing May 4, 1999.

On January 12, 2000, representatives from Norquick "initiated a procedure intended to purge oil/ammonia foam from the vessels and piping of the refrigeration system servicing" Norquick's food storage enterprise. (Compl. ¶ 8).  During the purging process, "large quantities of ammonia gas were released and spread throughout the premises," which subsequently caused an ammonia gas leak, fire and an explosion.  (Compl. ¶¶ 9-12).

As a result of the high levels of ammonia detected in the freezer, the Michigan Department of Agriculture (MDA) and the U.S. Department of Agriculture (USDA) seized and quarantined the inventory in the freezer, suspecting ammonia contamination and temperature abuse.  The food was found to be safe for human consumption and on April 7, 2000 it was released for sale on the open market.  (Def.'s Mot., Ex.'s 13, 14).

Prior to the release of the quarantined inventory, Plaintiff made two payments to Norquick.  The first payment was made on January 24, 2000, in the amount of $2 million for loss to "owned stock" and was made in protest "to mitigate business income loss".  *Federal Ins. Co. v. Hartford Steam Boiler Inspection and Ins. Co.*, 415 F.3d 487, 491 (6th Cir. 2005).  On April 6, 2000, Plaintiff

issued a second payment in the amount of $450,697, representing the "remainder of the stock loss." *Id.* Stoner & Company ("Stoner") secured a bid for 50% of the inventory value less salvage fees and costs. (*Id.* at 15). After the Stoner salvage bid was received, John Connor, President of Norquick, offered to purchase Federal's salvage inventory for 50% on behalf of a company to be formed (J Martin Enterprises L.L.C), but without the deduction for salvage fees/costs as requested in the Stoner bid. However, on February 22, 2000, Plaintiff accepted an offer from Norquick to repurchase the inventory from Plaintiff for fifty cents on the dollar without the deduction for salvage fees/costs. *Id.* Plaintiff then received $1,218,349 from Norquick as salvage return.

Defendant covered the cost to replace the valve handle assembly and to recharge the system with ammonia. *Id.* Plaintiff claims that Defendant has an obligation to provide additional insurance coverage for the loss, and Plaintiff is entitled to reimbursement for the payment advances to Norquick. Defendant argues that it is not liable for the inventory losses because any ammonia contamination resulted from the explosion, fire, or firefighting efforts. *Id.*

## III.   STANDARD OF REVIEW

The standard that must be satisfied to secure a dismissal via summary judgment is high. Pursuant to Rule 56(c), summary judgment may only be granted in cases where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." The moving party bears the burden of showing no dispute as to any material issue. *Equal Employment Opportunity Comm'n v. MacMillan Bloedel Containers, Inc.*, 503 F.2d 1086, 1093 (6th Cir. 1974). A dispute must be evident from the evidence in order to deny such a motion. Such a dispute must not merely rest upon the allegations or denials in the pleadings, but

3

instead must be established by affidavits or other documentary evidence. Fed.R.Civ.P. 56(e). When ruling, the Court must consider the admissible evidence in the light most favorable to the non-moving party. *Sagan v. United States of Am.*, 342 F.3d 493, 497 (6th Cir. 2003).

## IV.    APPLICABLE LAW & ANALYSIS

In reversing and remanding the Court's September 30, 2003 Judgment and Opinion and Order granting Summary Judgment in Defendant's favor, the Sixth Circuit Court of Appeals held,

> that Federal is not a volunteer [and thus its claim for equitable subrogation may proceed]; that Federal's Ammonia Contamination exclusion operates to deny coverage for inventory loss resulting from ammonia contamination; that Hartford's policy specifically provides coverage for the ammonia contamination losses not resulting from fire, explosion, and firefighting efforts; that the parties' "other insurance" clauses have no effect in this case; and that Federal is not entitled to penalty interest.

> *          *          *

> Hartford is not relieved of responsibility for the ammonia contamination that occurred prior to the explosion and fire even though the explosion and fire possibly raised already elevated levels of contamination in the warehouse freezer. The ammonia contamination damage and loss suffered by the inventory prior to the explosion and fire are clearly covered by Hartford's policy. Hartford is relieved of obligation for any *additional* ammonia contamination to the inventory resulting from the explosion, fire, or water (or other means) used to fight the fire. However, the record is unclear as to what - if any - ammonia contamination damage occurred to the inventory prior to the explosion, fire and firefighting efforts. The record is also unclear about whether the explosion, fire, and firefighting efforts contributed to any ammonia contamination suffered by the inventory. These are questions of fact. As a result, we remand this case to the District Court for a specific determination as to damages.

*Federal Ins. Co.*, 415 F.3d at 497 (emphasis in original). The Sixth Circuit stated issues of fact to be determined by the Court:

> The District Court is directed to determine the following:

> 1.      Whether the inventory was contaminated by ammonia prior to the explosion, fire, and firefighting efforts;

4

2.      If so, the amount of inventory loss (in dollars) attributable to the ammonia contamination that occurred prior to the fire, explosion, and firefighting efforts;

3.      Whether the inventory suffered additional ammonia contamination as a result of the fire, explosion, firefighting efforts, or any combination of the foregoing;

4.      If so, the amount of inventory loss (in dollars) attributable to the ammonia contamination that occurred as a result of the fire, explosion, firefighting efforts, or any combination of the foregoing;

5.      Whether the inventory was further contaminated by ammonia *after* the explosion, fire, firefighting efforts, or any combination thereof but *not* as a result of the fire, explosion, firefighting efforts, or any combination thereof; and

6.      If so, the amount of inventory loss (in dollars) attributable to the ammonia contamination that occurred *after* the explosion, fire, firefighting efforts, or any combination thereof but *not* as a result of the fire, explosion, firefighting efforts, or any combination thereof.

Hartford will compensate Federal only for those calculated inventory losses due to ammonia contamination that occurred not as a result of the fire, explosion, firefighting efforts, or any combination thereof, whether or not prior or subsequent to the fire, explosion, and firefighting efforts.

*Id*.

Defendant argues that the remaining issues to be determined by this Court are (1) whether Plaintiff Norquick's inventory suffered any contamination from the release of ammonia and (2) if so, what amount of Plaintiff Norquick's inventory loss is attributable to the ammonia contamination. Defendant contends that there was no contamination suffered from the release of the ammonia.

## A.      Ammonia Contamination As A Result of Fire, Explosion, Firefighting Efforts or Any Combination Thereof

The majority of the arguments presented by the parties is not centered around ammonia contamination as a result of the explosion, fire, and firefighting efforts and whether there was any contamination thereafter.  The Court will first address those issues.

Plaintiff argues that all of the ammonia migration and contamination occurred prior to the

5

explosion, fire, and firefighting efforts and none occurred thereafter.  (Pl.'s Mot. at 3).  Plaintiff asserts that this question of fact, as articulated by the Court of Appeals, is a result of the conflicting testimony of the parties' experts, Dr. Donald Hoffmann and Jeffery Henning.  Dr. Hoffmann, Plaintiff's expert, produced a report on January 24, 2003, which states that the explosion substantially increased the ventilation of the building and reduced the accumulation rate of ammonia in the building.  (*Id.*, Ex. B, p. 9).  Mr. Henning, Defendant's expert, states as one of his conclusions, "3.  Contribution of ammonia from the explosion is probable and can be estimated at an additional contribution of up to 200 ppm overall, with higher levels (up to 4000 ppm) near the doors likely." (Ex. C, p. 2).

On November 23, 2005, Dr. Hoffman released a supplemental report that rebuts Mr. Henning's testimony relating to the amount of ammonia Mr. Henning determined could have been released as a result of the explosion.  (Ex. D).  Dr. Hoffman's supplemental report makes the following findings,

> . . . it is clear that the ammonia increase in the freezer compartment due to the explosion was negligible and that the migration of ammonia prior to the explosion was the dominant force in the contamination of the food stuffs.  In fact, the explosion alone can only account for an increase of ammonia in the freezer of 0.0007 ppm; this value is essentially zero given the degree of contamination of the ammonia from the migration and accounts to a 0.006% increase in ammonia as compared to the known pre-explosion values.

(Ex. D, p. 4).  Dr. Hoffman concludes that "[t]he ammonia migration into the freezer was determined to be caused by the initial release of the ammonia and not caused by the fire, explosion, or fire fighting efforts."  (Ex. D, p. 5).  Dr. Hoffman further states at his February 28, 2006 deposition, "the explosion and subsequent fire did nothing but to reduce the quinones of ammonia that were exposed to any parts of the building, substantially reduce them, and ventilate the building."  (Ex. F, p. 49, 70).

6

At a deposition that occurred subsequent to the release of Dr. Hoffman's supplemental report, on March 28, 2006, Mr. Henning states, "I no longer agree with conclusion 3 based on information provided in Dr. Hoffman's follow-up report. Number 4, as you say, [was] adopted from Hoffman's initial report." (Ex. E., p. 64). Mr. Henning acknowledges that Dr. Hoffman's findings refute his conclusion and asserts that he no longer agrees with Conclusion 3 based on the findings of Dr. Hoffman. (*Id.* at 4, Ex. E, p. 64). Plaintiff argues that this testimony establishes that there is no question of fact that the explosion did not contribute ammonia contamination to the freezer or the inventory, and the Court agrees.

Plaintiff contends that water from the firefighting efforts similarly did not increase ammonia contamination. Plaintiff argues that Conclusion 4 of Mr. Henning's report, wherein he concludes that that the firefighting efforts contributed to ammonia contamination, is no longer valid because Mr. Henning admitted that Conclusion 4 was adopted from Dr. Hoffman's initial report. (Pl.'s Mot. at 5, Ex. E, p. 64). Plaintiff further argues that Dr. Hoffman's deposition testimony refutes Mr. Henning's Conclusion 4. (*See* Pl.'s Mot. at 5, Ex. F., pp. 50-51, 73).[1] Dr. Hoffman states, "the question was whether that water would add any ammonia to the freezer compartment. My opinion is no, it would not." (Ex. F, p. 73).

The expert testimony and reports establish that the firefighting efforts did not contribute any ammonia contamination to the freezer area. Although Mr. Henning originally concluded that the firefighting efforts contributed to ammonia contamination, when asked at his deposition whether there are any conclusions he still agrees with from his January 24, 2003 report, regarding Conclusion

---

[1] The page numbers cited by Plaintiff in its brief do not correspond to the deposition testimony, however, the correct pages are cited by the Court. (*See* Pl.'s Mot. at 5).

4, he merely states that this conclusion was adopted from Dr. Hoffman's initial report. The Court construes this, in light of Mr. Henning's deference to the opinions of Dr. Henning, as deferring to the findings of Dr. Henning as they relate to the effect of the firefighting efforts on the presence of ammonia contamination.

The parties have presented no evidence relating to whether there was further contamination after the explosion, fire, and firefighting efforts and any amount of inventory loss attributable thereto. The Court, therefore, finds that there is no material question of fact that there was no additional contamination after the explosion, fire, and firefighting efforts.

**B.**    **Occurrence of Ammonia Contamination/ Contamination Prior to Explosion, Fire, and Firefighting Efforts**

The parties principally deal with the presence, or absence, of ammonia contamination generally, without addressing ammonia contamination in a time frame manner as requested by the Court of Appeals. However, given the Court's above findings that the explosion, fire, and firefighting efforts did not contribute to any ammonia contamination, any ammonia contamination must logically have occurred prior to the explosion, fire and firefighting efforts. The Court proceeds to determine if ammonia contamination occurred.

"Under Michigan law, the right of an insurer who pays the total amount of a loss to seek contribution from a co-insurer who also is on the risk is based on the theory of subrogation." *Central Mich. Bd. of Trustees v. Employers Reinsurance Corp.*, 117 F.Supp.2d 627, 638 (E.D. Mich. 2000) (citing *Detroit Automobile Inter-Insurance Exchange v. Detroit Mut. Auto. Ins. Co.*, 337 Mich 50, 55 (1953). "Under the doctrine of subrogation a party not a volunteer who has paid a debt succeeds to all of the rights of the creditor whom he has paid, subject to all the defenses that may

8

have been asserted against that creditor.  The subrogree acquires those rights, but only those rights held by the subrogor." *American States Ins. Co. v. Taubman Co., Inc.*, 352 F.Supp. 197, 199 (E.D. Mich. 1972) (citing *Hartford Accident & Indemnity Co. v. Used Car Factory*, 461 Mich. 210, 215 (1999).  The subrogee acquires no greater rights than those of the subroger.  *Mich. Bd. of Trustees*, 117 F.Supp.2d at 638; *Hartford Accident & Indemnity Co. v. Used Car Factory*, 461 Mich. 210, 215 (1999).

It is the insured's burden to prove that a claim falls within the terms of the policy.  *Arco Indus. Corp. v. American Motorists Ins. Co.*, 448 Mich. 395 (1995).  Defendant asserts that since Plaintiff stands in the shoes of its insured, the burden of proof of demonstrating that the policy provides coverage is on Plaintiff.  (Def.'s Mot. at 14).  Plaintiff responds that it has met its burden of proving coverage and Defendant is precluded from arguing that coverage does not exist under the doctrine of claim preclusion because the Sixth Circuit has already determined that coverage exists. (Pl.'s Resp. at 1-2).  The Court of Appeals held that the Hartford policy provides coverage due to ammonia contamination, however, that does not relieve Plaintiff of the burden of proving ammonia contamination, which triggers coverage under the Hartford policy.  *Federal Ins. Co. v. Hartford Steam Boiler Inspection and Ins. Co.*, 415 F.3d 487, 496 (2005).

Plaintiff seeks recovery under the "Perishable Goods" provision found in Defendant's policy.  (Compl. ¶ 19).  The policy reads:

**2.  Coverages provided**
The following coverages are provided if shown in the Declarations.
The "accident" must occur during the Policy Period, but expiration of the policy does not limit our liability.
           *               *            *
**e.  Perishable Goods**
           *               *            *
    (3)     We  will  also  pay  for  your  *loss*  of  "perishable  goods"  *due to*

9

> *contamination* from the release of refrigerant, including but not
> limited to ammonia.

(Def.'s Mot., Ex. 2) (emphasis added).  Defendant argues that Plaintiff cannot prove that the goods in issue were subject to ammonia contamination, or that Norquick suffered a loss of perishable goods due to ammonia contamination, and as such Defendant is not liable to the Plaintiffs.  The parties admit that "contamination" is not defined in the policy.

In Michigan, the paramount goal when interpreting a contract is to give effect to the intent of the contracting parties.  *Old Kent Bank v. Sobczak*, 243 Mich. App. 57, 63-64 (2000).  The court is to read the agreement as a whole and attempt to apply the plain language of the contract itself.  *Id.*  If the intent is clear from the language of the contract itself, there is no place for further consideration or interpretation of the agreement.  *Farm Bureau Mut. Ins. Co. v. Nikkel*, 460 Mich. 558, 566 (1999).  A contract provision that is clear and unambiguous must be "taken and understood in [its] plain, ordinary and popular sense."  *Michigan Mut. Ins. Co. v. Dowell*, 204 Mich. App. 81 (1994).  Unambiguous contract provisions are not subject to interpretation and must be enforced as written.  *Id.*

A contract may be considered ambiguous when terms are factually inconsistent or the phraseology can suggest different meanings or obligations to be undertaken.  *Port Huron Educ. Ass'n MEA/NEA v. Port Huron Area Sch. Dist.*, 452 Mich. 309, 323 (1996).  Contract provisions are considered ambiguous when the "terms are reasonably and fairly susceptible to multiple understandings and meanings."  *Equitable Life Assurance Soc'y v. Poe*, 143 F.3d 1013, 1016 (6th Cir. 1998) (*citing Michigan Mut. Ins. Co.*, 204 Mich. App. at 81).  The initial determination of whether the contract language is ambiguous is a question of law for the court to decide.  *Rainbow Nails Enterprises, Inc. v. Maybelline, Inc.*, 93 F.Supp.2d 808, 820 (E.D.Mich. 2000) (*citing Port*

10

*Huron Educ. Ass'n*, 452 Mich. at 323). Once the court determines that the contract is ambiguous, it is subject to further construction or interpretation. "It is well settled that the meaning of an ambiguous contract is a question of fact that must be decided by the jury." *Klapp v. United Ins. Group Agency, Inc.*, 468 Mich. 459, 469 (2003). "In resolving such a question of fact, i.e., the interpretation of a contract whose language is ambiguous, the jury is to consider relevant extrinsic evidence." *Id.* "Looking at relevant extrinsic evidence to aid in the interpretation of a contract whose language is ambiguous does not violate the parol evidence rule." *Id.* at 470. Parol evidence bars language which adds to or detracts from the writing, but not evidence which merely ascertains the meaning of what the parties intended. *Id.* Ambiguity in a contract is resolved against the party who prepared it. *Lichnovsky v. Ziebart Int'l Corp.*, 414 Mich. 558, 566 (1999).

The parties attach different meanings to the term "contamination." Plaintiff points to Webster's New World College Dictionary's definition, which lists "makes impure" among the definitions of "contaminate". Plaintiff argues that contamination as it applies to this case means that perishable goods are not free from the ammonia released as a result of the mechanical breakdown of the refrigeration system valve. (Pl.'s Resp. at 7-8). Defendant points to the Fifth Circuit definition. The Fifth Circuit has stated that contamination "occurs when a condition of impairment or impurity results from mixture of contact with a foreign substance." *Royal Ins. Co. v. Bithell*, 868 F.Supp. 878, 882, n.5 (E.D. Mich. 1993) (quoting *Am. Cas. Co. v. Myrick*, 304 F.2d 179, 183 (5th Cir. 1962); *See* DELUXE BLACK'S LAW DICTIONARY 318 (6th ed. 1990). The Court adopts the Fifth Circuit and Black's Law Dictionary definition of contamination.

Defendant argues that the release of ammonia at Norquick's facility did not cause any of the goods to be unfit for use, or "otherwise make the inventory impure or unsuitable by mixture or

11

contact." (Def.'s Mot. at 17). Defendant first points to a letter/report prepared by Mark Ruddy of Stoner & Company, addressed to Sharon Smith of the MDA stating, "[a]mmonia vapor was never released into the freezer. . . It is our opinion that the food products are free of any contamination by ammonia which was demonstrated by the USDA accepted sensory testing and a follow up analytical testing procedures." (*Id.* at 6, Ex. 10, p. 2-3). Following testing by Dr. Irving Domsky of Allied Labs of 13 food samples believed to have the highest concentration of ammonia, Stoner & Company was advised that "all tests for free ammonia were negative. All samples did contain some naturally occurring ammonia compounds." (*Id.*)

Defendant next argues that the inventory was seized and detained based only on suspicions of contamination and the seizure does not indicate actual contamination. The MDA Notice of Seizure, dated January 13, 2000, states, "[f]rozen foods were found stored within walk-in freezers and exposed to concentrations of ammonia, which may have exceeded 150 ppm, in the vicinity of these food products . . . Food product is suspected to be contaminated.". (*Id.*, Ex. 11). Similarly, the USDA Notice of Detention states as the reason for detention, "possible ammonia contamination." (*Id.*, Ex. 12).

The February 10, 2000 MDA Notice of Seizure "disposition" states, "[l]aboratory results (Allied Labs, Villa Park, Il) indicate product not contaminated." (*Id.*, Ex. 13). The April 7, 2000 USDA Notice of Termination of Detention states, "product reinspected by Inspector Wayne Painter and found sound and wholesome." (*Id.*, Ex. 14). The results of a Report of Sampling and Analysis conducted by Clean Air Management, Inc. states, "[t]here is no overall trend of ammonia concentration from the case, to the product box, to the food product that would indicate food contamination as a result of the ammonia release from the fire event. Most or all of any airborne

12

ammonia 'contamination' was blocked from the food product box by the cases." (*Id.*, Ex. 20, p. 7). The Sample Plan of the Report concludes, "[f]ood product has not been damaged by ammoniacal contamination related to this event.  Product is salvageable."  (*Id.*, Ex. 20).

Plaintiff argues that presence of ammonia contamination is supported by the testimony of Carl Lafrate, Defendant's food specialist expert, who testified that ammonia contamination is evidenced by ammonia odor and that he smelled ammonia contamination in the packaging days after the release. (Pl.'s Resp. at 8, Ex. AA, p. 103-04)  Plaintiff also points to the testimony of Walt Geil, Plaintiff's general adjuster, who testified that he smelled ammonia in the cardboard packaging six days after the incident.  (*Id.*, Ex. P, pp. 15, 21-22).  Mr. Lafrate and Mr. Geil both testified to the smell of ammonia following the incident, however, Plaintiff provides no support in the record for the assertion that Mr. Lafrate stated that ammonia contamination is evidenced by ammonia odor, nor is the Court able to locate any such statement in Mr. Lafrate's reports.

Plaintiff also asserts that the Sampling and Analysis Report compiled by Clean Air Management, Inc. demonstrates the presence of ammonia contamination.  (Pl.'s Mot. at 7-8, Ex. J). Clean Air concluded that there was no ammonia contamination to the food product, as "[m]ost or all of the ammonia 'contamination' was blocked from the food product box by the cases.".  (Ex. J, p. 7).  Plaintiff finds it noteworthy that the study also concluded that the "[c]ardboard has acted as a 'sink' for ambient water-soluble ammonia in the event zone . . . Of the 95% of random and worst-case samples that returned with measurable concentrations, relatively elevated ammonia concentrations were found in cardboard cases potentially related to the fire event."  (Ex. J, p. 6). Plaintiff asserts that this evidence conclusively establishes that the perishable goods absorbed ammonia and are contaminated.

Defendant contends that Plaintiff relies heavily on the Clean Air Management Report as well as the June 23, 2006 Affidavit from the author of this Report, Jon Datillo, to support the contention that the cardboard boxes suffered ammonia contamination.  (Def.'s Mem. in Opp. at 11).  Defendant argues that the Clean Air Report does not state that cardboard boxes suffered actual contamination, as the word contamination was not used.  Defendant incorporates its arguments relative to its Motion to Strike into the Motion for Summary Judgment, asserting that the opinions in Mr. Datillo's affidavit were not timely disclosed and contradict his earlier testimony.

The first issue before the Court is whether Norquick's perishable goods were contaminated by the release of the ammonia.  As discussed above, the Court adopts the following definition of contamination - "occurs when a condition of impairment or impurity results from mixture of contact with a foreign substance."  It is not in dispute that there was a release of ammonia in or around the freezer area that contained the perishable goods.  The central question is whether the "Perishable Goods" came in "contact with a foreign substance" that resulted in an "impairment or impurity" to the goods.  "Impair" has been defined as, "to worsen, to decrease in strength, value, amount, or quality" and impurity has been defined as, "the quality or state of being impure, especially contamination or pollution, lack of consistency or homogeneity: adulteration."  WEBSTER'S II NEW RIVERSIDE UNIVERSITY DICTIONARY 612, 616 (1988).

The following evidence supports the conclusion that the food product was not contaminated by ammonia:

1.    The Clean Air Report concluding, "[t]here is no overall trend of ammonia concentration from the case, to the product box, to the food product that would indicate food contamination as a result of the ammonia release from the fire event.

14

Most or all of the any airborne ammonia 'contamination' was blocked from the food product box by the cases.";

2.     the letter/report prepared by Mark Ruddy of Stoner & Company of February 7, 2000 stating, "food products are free of any contamination by ammonia" as determined from testing conducted by Allied Labs;

3.     the February 10 MDA Notice of Seizure "disposition" stating, "[l]aboratory results (Allied Labs, Villa Park, Il) indicates product not contaminated."

4.     The April 7, 2000 USDA Notice of Termination of Detention stating, "product reinspected by Inspector Wayne Painter and found sound and wholesome.".

The evidence establishes that there was no material question of fact that there was no ammonia contamination to the inventory encased in the cardboard packaging.

Plaintiff contends that the cardboard case packaging constitutes "Perishable Goods" and is covered property under the Hartford policy.  (*Id.* at 10, n. 10; Pl.'s Resp. at 5-6)  Citing a Request for Admission, Plaintiff asserts that Defendant admitted that the cardboard case is included within the term "Perishable goods" in the Hartford policy.[2]  Defendant responds that the case packaging

───────────────

[2] **REQUEST FOR ADMISSION NO. 15**.
Do you admit that the cardboard cases referenced in the Clean Air Management report of March 27, 2000 are included within the term "Perishable Goods" as defined in The Hartford Steam Boiler Inspection and Insurance Company policy?

**RESPONSE**:
HSB objects to Request No. 15 on the ground that it calls for an irrelevant admission.  In addition, HSB objects to Request No. 15 on the grounds that it calls for the interpretation of the HSB policy which is the subject matter of this lawsuit  and otherwise seeks a legal conclusion.
Subject to and without waiving any of its objections, HSB admits Plaintiff's Request for Admission No. 15.

actually served its purpose, by remaining "intact following the release [of the ammonia] and was sold as part of the final disposition of the inventory, without any repackaging.  Hence, the release did not render the packaging unfit for its intended use."  (Def.'s Mot. at 10, n. 9; Def.'s Mem. of Law in Opp'n. at 15).  Defendant further argues that the inventory did not lose any value to Norquick since the inventory was released by the USDA in April of 2000 and Norquick sold most, if not all, of the product to Farmer Jack as salvage inventory at 5% over cost.  (*Id.* at 11, Ex. 26, pp. 140-43).

Defendant would like the Court to find that, since the case packaging served its purpose in protecting the interior goods from ammonia contamination, the inventory was sold without repackaging and did not lose any value, the cardboard packaging was not perishable goods as defined in the Hartford policy.  The definition of "perishable goods" within the Hartford policy is a question of fact.  Defendant clearly admitted, as a response to a Request for Admission regarding the interpretation of its own policy, that the cardboard cases fall within the term "Perishable Goods" as defined in the Hartford policy.  As the cardboard cases fall within the term "Perishable Goods" in the Hartford policy, the Court must determine whether there was contamination to the cardboard cases.

The Clean Air Report, which is not refuted to the extent that it deals with the cardboard cases, establishes that there was ammonia contamination to the cardboard cases.  The Court does not find it necessary to address the merits of Defendant's Motion to Strike the Affidavit of Jon Dattilo, as a consideration of this affidavit is not necessary for the Court's finding.  The Clean Air Report clearly states, "relatively elevated ammonia concentrations were found in cardboard cases." (Ex. J, p. 6).  Defendant has offered no evidence to refute this finding and the Court does not find

it significant that the Report does not use the term "contamination". The Court finds there is no question of material fact that there was ammonia contamination to the cardboard cases.

2. **Inventory Loss Attributable to Ammonia Contamination Prior to the Fire, Explosion and Firefighting Efforts**

Plaintiff argues that Defendant must compensate Plaintiff in the amount of $1,232,348 due to ammonia contamination of the perishable goods. Plaintiff contends that the proper measure of damages in this case is diminution in value. Plaintiff points to Michigan Model Civil Jury Instruction 51.03, which provides that the measure of damages for personal property that is irreparably damaged is the difference between the fair market value immediately before the occurrence and its fair market value after the occurrence. The Notes on Use to M. Civ. JI 51.03 state that this instruction is appropriate only where the property is damaged beyond repair, is still in existence, but has salvage value.

Plaintiff argues that Dr. Hoffman's unrefuted testimony is that every part of the exterior case packaging of approximately 150,000 cases in the freezer, valued at $2,450,697 at cost, was contaminated by ammonia. Plaintiff asserts that because an insured's rights and an insurer's obligations attach at the time of loss,

> HSB's coverage was triggered by the mechanical breakdown insured under the HSB policy and its duty to pay Federal's subroger's losses accrued at that time. . . . HSB has recanted its position that the loss was caused by fire, explosion or firefighting efforts so . . . HSB is responsible for all of Federal's subroger's losses and, since Federal is the equitable subrogee according to the 6th Circuit, it is entitled to recover those losses from HSB.

(Pl.'s Resp. at 14-15). Plaintiff proceeds to cite the testimony of Carl LaFrate, Defendant's expert food specialist, who admitted that Norquick's customers would not accept food even if it was tested and cleared for sale. (*Id.* at 15, Ex. H, pp. 6, 8). Plaintiff argues that the contaminated inventory

17

was worthless in the ordinary wholesale market on the date of loss. (*Id.* at 16). Plaintiff calculates the monetary loss of the inventory due to contamination as the cost of goods minus the fair market salvage value, or $1,232,348 ($2,450,697 minus $1,218,349 received in salvage). (Pl.'s Mot. at 19-20).

Plaintiff contends that its mitigation efforts were reasonable. Stoner & Company secured a bid for 50% of the inventory value less salvage fees and costs. (*Id.* at 15). Plaintiff cites the testimony of F.J. Garvin, a defense expert, who stated that a 50% cost bid for the inventory "is both fair and to be expected when a stock this size is offered on the secondary market." (*Id.* at 18, Ex. W., p. 2). Plaintiff states that after the Stoner salvage bid was received, Mr. Connor, on behalf of a company to be formed (J Martin Enterprises L.L.C), offered to purchase Federal's salvage inventory for 50%, but without the deduction for salvage fees/costs as requested in the Stoner bid. Federal's decision to sell the inventory to Mr. Connor resulted in a 10% greater return. (Def.'s Mot. at 19). Plaintiff asserts that the price Mr. Connor received after the product was released by the USDA is not relevant to the value of the product on the date of loss. Pl.'s Mot. at 19; *Pink v. Smith*, 281 Mich. 107, 113 (1937).

Defendant asserts that even if Plaintiff can prove some ammonia contamination, it cannot prove any monetary loss attributable to such contamination and there is no compensable loss under the Hartford policy. (Def.'s Mot. at 19-20). Namely, Defendant argues that Plaintiff has failed to offer any evidence of any actual loss suffered by Norquick. (Def.'s Mem. in Opp. at 16). Defendant contends that the only evidence Plaintiff can present on damages is the Stoner report. (Ex. 33). Defendant argues that the Stoner report merely addresses the value of the inventory on the secondary market based on factors, such as size of the stock and costs associated with moving the inventory

18

out of Norquick's freezer, and fails to address the amount of loss that Norquick would be entitled to under the Hartford policy for ammonia contamination. (Def.'s Mot. at 19). Defendant argues, "Federal is not seeking $1,232,348 for the claimed contamination, if any, to the cardboard boxes[,]" but instead wants to "recover what it paid regardless of the actual damages, or the fact that its insured suffered no actual loss." (Def.'s Mem. of Law in Opp. at 16). Defendant contends that the proper measure of damages is not diminution in fair market value,[3] but the amount Norquick could have recovered from Defendant under the Hartford Policy. Defendant asserts that because Norquick sold the inventory at full market value, it suffered no loss and Plaintiff is entitled to nothing from Defendant. (*Id.* at 16-17).

Defendant further asserts that any loss to Norquick's perishable goods inventory was a result of the enforcement of a law, ordinance or regulation, which was expressly excluded under the Hartford policy. The Hartford policy provides,

**B.    EXCLUSIONS**

1.    We will not pay for loss or damage caused by or resulting from:

\*                    \*                    \*

b.    The enforcement of any ordinance, law, regulation, rule or ruling regulating or restricting repair, replacement, alteration, use, operation, construction or installation, except as provided under the following coverages: Demolition and ICC, Hazardous Substances or CFC Refrigerants.

(Def.'s Mot., Ex. 16). Defendant asserts that the MDA and USDA ordered the seizure of Norquick's perishable goods inventory following the ammonia release, therefore, triggering this exclusion.

---

[3] Defendant argues that even if diminution in fair market value were the proper measure of damages, there was no diminution in value since the product was sold for full market value, at its original price.

Defendant argues that any loss to Norquick's perishable goods inventory was caused by the enforcement of these seizure orders, which remained in effect for approximately 30 days (MDA) and 90 days (USDA), which restricted Norquick's use of its inventory and freezer space during this period.  (Def.'s Mem. of Law in Opp. at 18).

The Court of Appeals reversed and remanded this Court's Opinion and Order to determine "the extent and amount to which Federal suffered compensable damages."  *Federal Ins. Co.*, 415 F.3d at 498.  The Opinion of the Court of Appeals states, "Hartford will compensate Federal only for those calculated inventory losses due to ammonia contamination that occurred *not* as a result of the fire, explosion, firefighting efforts, or any combination thereof, whether or not prior or subsequent to the fire, explosion and firefighting efforts."  *Id.* at 497 (emphasis in original).  The question before the Court is the amount of loss (in dollars) to Norquick's inventory resulting from ammonia contamination not attributable to the fire, explosion or firefighting efforts.

In light of the determination of this Court that the only ammonia contamination was to the cardboard boxes, the Court finds merit in Defendant's argument that "Federal has never quantified, much less offered any evidence of, the amount of damages that was caused by the claimed contamination, if any, to the cardboard boxes, choosing instead to rely simply on the amount of its payment to Norquick."  (Def.'s Mem. in Opp. at 16).  However, Mr. LaFrate, Defendant's expert, testified as follows, "I also told him that Norquick's customers would not accept the food even if the tests came back negative for ammonia.  USDA would have to release the detained product within the next few days in order for Norquick to sell it to their usual customers."  (Ex. H, p. 8).  Although Defendant would like the Court to draw a distinction between the product and the cardboard boxes, as discussed above, the cardboard boxes and their contents both constitute perishable goods.  By

20

virtue of the contamination to the cardboard boxes, there was no market for the purchase of the goods contained in the cardboard boxes.  The reasonableness of the amount Plaintiff received at salvage is not a question of fact, as experts on both sides agree that the amount received at salvage was reasonable.  Technically, Plaintiff mitigated damages by selling the goods at salvage and should not be penalized for doing so.  Therefore, the loss to Plaintiff is the fair market value of the goods minus the fair market salvage value, or $1,232,348 ($2,450,697 minus $1,218,349 received in salvage), which represents the amount Plaintiff, as subrogee of Norquick, is entitled to recover.

The Court does not find applicable the provision in the Hartford policy relating to the enforcement of a law, ordinance or regulation.  The seizure by the USDA and MDA, which may constitute the enforcement of an law, ordinance or regulation under the Hartford policy, may have caused a loss to Norquick.  However, the exclusion does not apply because the ammonia contamination occurred prior to the seizure and the ammonia contamination was the principal cause of the loss, as opposed to the enforcement of a law, ordinance or regulation.  Defendant is not relieved of liability as a result of this exclusion in the Hartford policy.

Accordingly,

IT IS HEREBY ORDERED that Plaintiff's Motion for Summary Judgment [Docket No. 82, May 8, 2006] is GRANTED.

IT IS FURTHER ORDERED that Defendant's Motion for Summary Judgment [Docket No. 76, filed May 8, 2006] is DENIED.

21

IT IS ORDERED that Defendant pay Plaintiff $1,232,348.00 plus statutory interest and costs.

S/ DENISE PAGE HOOD
DENISE PAGE HOOD
United States District Judge

DATED: March 31, 2007

I hereby certify that a copy of the foregoing document was served upon counsel of record on March 31, 2007, by electronic and/or ordinary mail.

S/William F. Lewis
Case Manager

22